**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| JUDICIAL WATCH, INC., | : | | |
| | : | | |
| Plaintiff, | : | | |
| | : | Civil Action No.: | 15-0688 (RC) |
| v. | : | | |
| | : | Re Document Nos.: | 28, 29 |
| U.S. DEPARTMENT OF STATE, | : | | |
| | : | | |
| Defendant. | : | | |

<u>**MEMORANDUM OPINION**</u>

**GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S CROSS-MOTION FOR
SUMMARY JUDGMENT**

## I.  INTRODUCTION

Judicial Watch requested documents from the Department of State related to potential

conflicts of interest Secretary Clinton may have had with the Clinton Foundation.  The parties

have come to agree upon the appropriate disclosures for much of the request, but have reached

an impasse with respect to other materials.  The State Department maintains that the scope of its

search was appropriate under the law and that it was justified in withholding or redacting certain

documents.   The State Department withheld part or all of ten documents under the statutory

exemption for materials that reflect an agency's deliberative process, and redacted the private

email addresses of third parties in three documents under the personal privacy exemption.

Judicial Watch contends that there were multiple flaws in the State Department's search process,

and that several of the withheld documents were not exempt under the deliberative process

privilege, because they pertained to matters outside the purview of the State Department and

involved persons outside the Department.  Judicial Watch also contends that some of the

documents containing information withheld pursuant to the deliberative process privilege contain factual material that must be segregated and produced.  Judicial Watch further argues that the identities of private email addresses—even those not associated with Hillary Clinton's private email server—are important to the public because they might show that private emails were used pervasively in the State Department during former-Secretary Clinton's tenure.

The Court finds that although the Department of State's search was reasonable in most respects, it unreasonably failed to search the emails turned over by Huma Abedin.  The Court further finds that the private email addresses of individuals who were not yet affiliated with the State Department are not of sufficient public concern to outweigh the risk of undue harassment that disclosing private email addresses could entail.  However, there is no privacy interest in the mere domain extensions of email addresses, when release of the domain extension would not reveal the owner's full email address and the agency does not make any showing suggesting that the third party has such an interest.  The Court also finds that several of the withheld documents withheld under the privilege for an agency's deliberative process contained reasonably segregable factual material.  Finally, with respect to six documents withheld under the privilege, the Court will order the parties to supplement the record with further briefing and factual support.

## II.  FACTUAL BACKGROUND

Judicial Watch brings this Freedom of Information Act ("FOIA") case against the Department of State ("State") seeking certain documents related to former-Secretary of State Hillary Clinton and the Clinton Foundation.[1]  *See* Compl. ¶ 5, ECF No. 1.  In March 2015,

---

[1] According to its website, the Clinton Foundation "build[s] partnerships between businesses, NGOs, governments, and individuals everywhere to work faster, leaner, and better;

Judicial Watch requested access to "all records . . . related to State Department review of donations to the Clinton Foundation for potential conflicts of interest with former-Secretary Clinton's Role as Secretary of State." Compl. ¶ 5. Plaintiff also requested "all records that identify the policies and/or procedures in place to ensure that former-Secretary of State Hillary Rodham Clinton's personal or charitable financial relationships with foreign leaders, foreign governments, and business entities posed no conflict of interest to her role as Secretary of State." *Id.* Plaintiff confined its request to between January 1, 2009 and January 31, 2013. Compl. ¶ 5. After State allegedly failed to take sufficient action on the request, Judicial Watch filed this lawsuit in May 2015. *See* Compl. at 4.

### A. State's Search Process

State's Office of Information Programs and Services ("IPS") is responsible for processing FOIA requests. *See* Decl. of Eric F. Stein ("Stein Decl.") ¶¶ 1, 9.[2] Generally, when the State Department receives FOIA requests, IPS decides which offices and record systems "may reasonably be expected to contain the records requested" based on its familiarity of the Department and the purposes of its various offices. Stein Decl. ¶ 9. Each office within State "maintains files concerning . . . matters related to the daily operations of that office." Stein Decl. ¶ 10. Here, IPS determined that the only offices reasonably likely to contain responsive records

---

to find solutions that last; and to transform lives and communities from what they are today to what they can be, tomorrow." *See About Us*, Clinton Foundation, https://www.clintonfoundation .org/about (last visited Feb. 2, 2017).

    [2] State relies on the declaration of Eric F. Stein to support its motion for summary judgment. *See generally* Def.'s Mot. Summ. J., ECF No. 28. Eric F. Stein is the acting co-director of the Office of Information Programs of the State Department. *See* Stein Decl. ¶ 1. Mr. Stein is the official immediately responsible for responding to FOIA requests. *See* Stein Decl. ¶ 1. Mr. Stein also submitted a supplemental declaration in support of State's opposition to Judicial Watch's motion for summary judgment. *See* Suppl. Decl. of Eric F. Stein ("Second Stein Decl."), ECF No. 32-1.

were the Office of the Legal Adviser, the Office of the Executive Secretariat, and the Retired

Records Inventory Management System ("RIMS").  Stein Decl. ¶ 11.  IPS also determined that

materials sent from certain non-state.gov email addresses were also reasonably likely to contain

responsive records.[3]  Stein Decl. ¶ 11.  The Court will further describe State's search process

based on the individual search targets.

### 1.  Office of the Legal Adviser

In its search of the Office of the Legal Adviser, IPS searched for documents only from

the Office of Ethics and Financial Disclosure, because "[a]n employee who was knowledgeable

of both the FOIA request at issue and [the Office of the Legal Adviser]'s records systems

determined" that this sub-office was the only one reasonably likely to yield responsive

documents.[4]  *See* Stein Decl. ¶ 13.  An employee searched the office's electronic document

management system—which is "a state-of-the-art electronic records management system that

permits full-text searches of documents," including archived emails and Microsoft Word

documents—using several search terms related to the request.[5]  *See* Stein Decl. ¶ 14 & n.1.  This

"content server" is not a comprehensive repository of all records in the office, but includes only

those specifically uploaded to it.  *See* Suppl. Decl. of Eric F. Stein ("Second Stein Decl.") ¶ 4.

The Assistant Legal Adviser of the Office of Ethics and Financial Disclosure also searched her

---

[3] State searched both State Department documents and the emails that former-Secretary Clinton later produced to the State Department.  However, the parties have agreed that "no further search, production, or briefing concerning potentially responsive records" is needed in this case of the 55,000 pages former-Secretary Clinton turned over.  Joint Status Report, ECF No. 17.

[4] The Office of Ethics and Financial Disclosure provides ethical advice to State employees.  *See* Stein Decl. ¶ 13.

[5] The following words and phrases were used in the search of the Office of Ethics and Financial Disclosure: "Secretary," "Clinton," "ethics," "agreement," "conflict of interest," "recusal," "conflict," "Clinton Foundation," "foundation," and "donation."  *See* Stein Decl. ¶ 14.

own files for responsive documents using similar terms.[6]  *See* Stein Decl. ¶ 15.  These terms

were agreed upon by the parties in advance.  *See* Second Stein Decl. ¶ 5, ECF No. 32-1.  The

terms used to search the document management system were "broader, but no less effective"

than those agreed upon by the parties.  Second Stein Decl. ¶ 5  In total, the search of the Office

of the Legal Adviser located ten responsive documents, of which six were produced in full, two

were withheld in part, and two were withheld in full.  Stein Decl. ¶ 16.

### 2.  Office of the Executive Secretariat

A management analyst with knowledge of the request and the systems searched for

responsive documents in the Office of the Executive Secretariat.[7]  Stein Decl. ¶ 18.  The Office

of the Executive Secretariat is the custodian of records for the Office of the Secretary and

maintains shared electronic office folders that were available to employees in the Office of the

Secretary during former-Secretary Clinton's tenure.  *See* Stein Decl. ¶ 20; Second Stein Decl.

¶ 7.  The management analyst conducted a search of the electronic record systems "reasonably

likely to contain responsive records" using terms agreed upon by the parties.  Stein Decl. ¶ 18.

The search terms were different than those used in the search of the Office of the Legal Adviser.

*See* Stein Decl. ¶¶ 14–15, 18.  An IPS analyst also searched "records retired by the Office of the

Executive Secretariat," which are contained in shared electronic folders available to Secretary

---

[6] The following words and phrases were used in the search of the Office of the Assistant Legal Adviser: "Clinton and ethics agreement," "Clinton and conflict of interest," "Clinton and recusal," "Clinton and conflict," "Secretary and ethics agreement," "Secretary and conflict of interest," "Secretary and recusal," "Secretary and conflict," "Clinton Foundation and donation," and "foundation and donation."  *See* Stein Decl. ¶ 15.  A paper file entitled "Secretary" was also searched.  Stein Decl. ¶ 15.

[7] The Office of the Executive Secretariat "is responsible for coordination of the work of the [State] Department internally, serving as a liaison between the Department's bureaus and the offices of the Secretary, the Deputy Secretaries, and the Under Secretaries."  Stein Decl. ¶ 17.

Clinton and her staff during her tenure, using slightly different terms. *See* Stein Decl. ¶ 20. In total, the searches yielded one document that was withheld in part. *See* Stein Decl. ¶ 19.

### 3.  Retired Records Inventory Management System ("RIMS")

The RIMS system is a database of retired State Department records. *See* Stein Decl. ¶ 21. Researchers can use the system to search the text of document manifests in order to locate a group of retired paper files. *See* Stein Decl. ¶ 21. Once such a group of documents is located, State must search the box manually. Stein Decl. ¶ 21. Although the IPS analyst identified two groups of documents with potentially-responsive materials, the manual search yielded no responsive records. *See* Stein Decl. ¶ 22.

### 4.  Non-state.gov Accounts

After determining that materials sent from certain non-state.gov email accounts were reasonably likely to contain responsive records, IPS conducted a full-text search of certain emails using terms agreed upon by the parties. *See* Stein Decl. ¶¶ 23, 25. Prior to Judicial Watch's request, former-Secretary Clinton had "provided to the [State] Department paper copies of approximately 30,000 [emails], comprising approximately 55,000 pages." Stein Decl. ¶ 24. She did so pursuant to a Department of State letter to former Secretaries of State requesting a copy of all emails known by them or their representatives to have been sent or received on a personal email account while serving as Secretary of State. Stein Decl. ¶ 24. After a search by an analyst with knowledge of the request and records, no responsive documents were located. Stein Decl. ¶ 25. An IPS analyst also conducted a search of retired non-state.gov records in shared folders available to the employees in the Office of the Secretary, and the personal folders of Cheryl Mills and Jacob Sullivan using agreed-upon search terms. Stein Decl. ¶ 26. Cheryl Mills was the Counselor for the Department of State during some of the years relevant to the FOIA request

at issue and was appointed after former-Secretary Clinton assumed office.[8]  Jacob Sullivan was the Director of Policy Planning—which is "a rank equivalent to an Assistant Secretary of State"—at the State Department from 2011 to 2013.[9]  This search yielded five responsive documents, three of which were withheld in full and two of which were withheld in part.  Stein Decl. ¶ 26.

Cheryl Mills and Jacob Sullivan were, of course, not the only advisers that worked with Hillary Clinton when she was Secretary of State.  Then-Secretary Clinton exchanged hundreds of publicly-available emails with Lauren Jiloty, Robert Russo, Monica Hanley, and Lona Valmoro. *See* Decl. of Chris Fedeli ¶ 2, ECF No. 29-3.  She also exchanged emails with Huma Abedin, who has previously turned over emails sent or received on a personal email account.  *See* Second Stein Decl. ¶ 7; *Judicial Watch v. United States Dep't of State*, 2016 U.S. Dist. LEXIS 62283, *6–7 (D.D.C. May 4, 2016).  According to State, the subject-matter of the FOIA requests is not within the scope of these staffers' respective responsibilities.  *See* Second Stein Decl. ¶ 7. Notably, however, while Huma Abedin worked for the State Department, she was "allowed to engage in private sector work while also working at the State Department," specifically as a consultant with the Clinton Foundation.  *Judicial Watch*, 2016 U.S. Dist. LEXIS 62283, at *1.

### B. Responsive Documents

In total, the searches yielded 16 responsive documents.  *See* Stein Decl. ¶ 6.  IPS released six documents in full, withheld five documents in part, and withheld five documents in full.

---

[8] *See* Office of the Historian, *Counselors*, United States Department of State Bureau of Public Affairs, https://history.state.gov/departmenthistory/people/principalofficers/counselor (last visited Feb. 2, 2017).

[9] *See* Office of the Historian, *Directors of Policy Planning*, United States Department of State Bureau of Public Affairs, https://history.state.gov/departmenthistory/people/ principalofficers/director-policy-planning (last visited Feb. 2, 2017).

Stein Decl. ¶ 6.  State claims that these withholdings are justified by two statutory FOIA

exemptions: the deliberative process privilege ("Exemption 5") and the exemption for personal

privacy ("Exemption 6").  *See* Stein Decl. at 10–12.  Judicial Watch challenges the withholding

of all documents under the deliberative process privilege, and two withholdings of private email

addresses under the personal privacy exemption.  *See* Pl.'s Cross-Mot. Summ. J. ("Pl.'s Mot.

Summ. J.") at 3–6, ECF No. 29.  The Court will organize its description of the disputed

withholdings based on claimed exemptions.

1.  Documents Withheld on the Basis of the Deliberative Process Privilege

The first six disputed documents that State withheld—C05867882, C05892232,

C05892233, C05892234, C05892235, and C05892237—all contain materials related to then-

Senator Clinton's preparation for her Senate confirmation hearings.  *See* Stein Decl. ¶¶ 34, 36–

38, 42–43.  The first document is a two-page draft letter from then-Senator Clinton to a State

Department ethics attorney "regarding the Secretary's 'Ethics Undertakings' should she be

confirmed as Secretary of State."  Stein Decl. ¶ 34.  The second is an email, forwarded from one

State Department official to another, containing a five-page email exchange between Cheryl

Mills and then-Senator Clinton "that contains proposed talking points for addressing ethical

considerations in her Senate confirmation hearing."  Stein Decl. ¶ 36.  The third document is

another email exchange between two non-State employees concerning the same talking points,

forwarded by the same State Department officials.  Stein Decl. ¶ 37.  The fourth is a revised

version of those same talking points.  Stein Decl. ¶ 38.  The fifth disputed document contains a

set of "questions for the record" and proposed responses for former-Secretary Clinton's

confirmation proceedings.  Stein Decl. ¶ 42.  The final confirmation-related document is a 65-

page document entitled "Pre-hearing Questions Submitted to Legal Adviser-Designate Harold

Hongju Koh by Senator Richard Lugar."  Stein Decl. ¶ 43.  Mr. Koh was not employed by the

State Department until after former-Secretary Clinton assumed office.[10]  That document contains

40 questions—apparently submitted by Senator Lugar—and proposed responses for Legal

Adviser-Designate Harold Hongju Koh.[11]  Stein Decl. ¶ 43.

The seventh-through-tenth disputed documents that State withheld—C05880711,

C05867888, C05867890, and C05867776—identify potential ethical conflicts for former-

Secretary Clinton.  *See* Stein Decl. ¶¶ 35, 39–41.  The seventh is a draft memorandum from

ethics counsel "regarding a request from Secretary Clinton to participate in a future speaking

engagement" for an undisclosed group.  Stein Decl. ¶ 35.  The eighth is a partially-disclosed

intra-agency email exchange "relating to a request from the Clinton Foundation seeking approval

of two sponsors that was submitted to the [State] Department's Ethics Office."  Stein Decl. ¶ 39.

The ninth disputed document was also a partially-disclosed email exchange relating to an ethics

request concerning the potential sponsorship of an event featuring former-President Bill Clinton

by a foreign government.  Stein Decl. ¶ 40.  The final disputed document in this category was

another email exchange regarding "a consulting agreement being considered by former-President

[Bill] Clinton," and whether it posed any conflict of interest with former-Secretary Clinton's

official duties.  Stein Decl. ¶ 41.  For each of these withholdings, State "conducted a line-by-line

---

[10] *See* Office of the Historian, *Harold Hongju Koh*, United States Department of State Bureau of Public Affairs, https://history.state.gov/departmenthistory/people/koh-harold-hongju.

[11] In his declaration, Mr. Stein states simply that the document is entitled "Pre-hearing questions submitted to Legal Adviser-Designate Harold Hongju Koh by Senator Richard Lugar," and that "[t]he document contains 40 questions and proposed responses."  Stein Decl. ¶ 43.  It appears that the document was meant to elicit responses from Mr. Koh, Stein Decl. ¶ 43, who was confirmed over five months after Secretary Clinton, about his own confirmation hearings, *see* Office of the Historian, *Harold Hongju Koh*, United States Department of State Bureau of Public Affairs, https://history.state.gov/departmenthistory/people/koh-harold-hongju (last visited Feb. 2, 2017).  However, the parties may wish to elaborate further concerning the context for the document's creation, purpose, and use in subsequent briefing.

review of the document and determined that there was no additional reasonably segregable, non-exempt material that could be released." *See* Stein Decl. ¶¶ 35, 39–41.

### 2. Documents Withheld on the basis of Personal Privacy

Judicial Watch also seeks disclosure of the non-state.gov email addresses contained in two of the above documents—C05892232 and C05892233, which relate to then-Senator Clinton's nomination—despite State's claims that doing so "could result in unsolicited attention" to the person with the email account and "would shed no light on the conduct of U.S. Government business." *See* Stein Decl. ¶¶ 36–37.  State provides no evidence of who maintains the email addresses.  *See* Stein Decl. ¶¶ 36–37.  However, none of the withheld addresses "were ones that were associated with the domain name '@clintonemail.com.'" *See* Second Stein Decl. ¶ 9.  In July 2016, State disclosed the names of the individuals associated with the withheld addresses to Plaintiff, in some cases including their email prefixes (that is, the portions of the addresses before the "@") and released the full email addresses that were associated with "@hillaryclinton.com" and "@clinton.senate.gov." *See* Second Stein Decl. ¶ 10.

## III.  LEGAL STANDARD

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing *Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007)). Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment when the pleadings, discovery materials, and any pertinent affidavits show that there is no genuine issue as to any material fact showing that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In the context of FOIA, the district court reviews the record *de novo*, and the withholding agency bears the burden of proving

compliance with the statute. *Pinson v. U.S. Dep't of Justice*, 160 F. Supp. 3d 285, 292 (D.D.C. 2016). The specific legal standards associated with the issues presented here are analyzed in their respective sections below.

## IV.  ANALYSIS

State moves for summary judgment on the basis that its search was reasonably calculated to uncover the responsive documents, and that it lawfully withheld ten documents under the deliberative process privilege—five in whole, five in part—and portions of three documents under the FOIA exemption to protect the personal privacy of third parties. Judicial Watch cross-moves for summary judgment on the basis that State failed to account for certain potential sources of responsive documents in its search, is not entitled to the deliberative process privilege because some of the documents involve non-Department subject matter and others contain reasonably-segregable material, and is not entitled to withhold email addresses in two documents because the identities of those addresses could shed light on the extent of those officials' use of private email servers. State has not adequately justified its failure to search the emails produced by Huma Abedin, who worked for both the Clinton Foundation and the State Department during the time of the request. State has also withheld reasonably segregable material, both in the form of substantive facts and certain portions of withheld email addresses. That said, State is correct that its search was reasonable in many respects, and that the privacy interests implicated by the release of certain email addresses outweigh the public's interest in them. With respect to other issues related to the deliberative process privilege, the Court will deny both motions for summary judgment, but allow the parties to file renewed motions for summary judgment after further briefing and factual development.

### A. Adequacy of the Search

State contends that its search was reasonably calculated to uncover the documents that

Judicial Watch requested, satisfying FOIA's adequacy of search requirement.  *See* Def.'s Mem.

P. & A. Supp. Def.'s Mot. Summ. J. ("Def.'s Mot. Summ. J.") at 4, ECF No. 28.   State

specifically reasons that it directed its search at the offices reasonably likely to have responsive

records, and "applied appropriate search terms to the offices, record systems, and materials . . . it

searched."  *See id.* at 5.  Judicial Watch argues that the Stein Declaration "does not explain why

[State] searched the particular locations it searched," why searching the Office of the Legal

Adviser's individual employees' records was necessary in light of the Office's state-of-the art

document management system, or why IPS used different search terms in searching different

systems.  *See* Pl.'s Mot. Summ. J. at 10–11, ECF No. 29.  Judicial Watch further argues that

State does not adequately explain why it did not search the State Department's State Messaging

and Archive Retrieval Toolset ("SMART"), which preserves employee emails.  *See id.* at 11–12

(citing a May 2016 Office of the Inspector General Report).  Plaintiff also argues that State

provided no justification for searching the emails of Cheryl Mills and Jacob Sullivan but not

those of other State Department advisers.  *See id.* at 12.  Judicial Watch takes particular issue

with State's failure to search Huma Abedin's official emails.  *See id.* at 13.  State responds that

its evidence shows that its search was reasonably calculated to locate all responsive records and

made in good faith.  *See* Def.'s Reply Br. in Supp. Mot. Summ. J. & Opp'n Pl.'s Cross-Mot.

Summ. J. ("Def.'s Reply") at 1–6, ECF No. 32.

"To prevail on summary judgment . . . the defending 'agency must show beyond material

doubt . . . that it has conducted a search reasonably calculated to uncover all relevant

documents.'"  *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting *Weisberg v. U.S.*

*Dep't of Justice*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)).  Although agencies need not search every record system, "agencies must conduct a good faith, reasonable search of those systems of records likely to possess the requested records."  *Marino v. Dep't of Justice*, 993 F. Supp. 2d 1, 9 (D.D.C. 2013) (citing *Oglesby v. Dep't of Army,* 920 F.2d 57, 68 (D.C. Cir. 1990), *overruled in part on other grounds*, 79 F.3d 1172 (D.C. Cir. 1996)).  An agency may meet its burden of showing reasonableness via a declaration by "responsible agency officials," so long as the declaration is reasonably detailed and "not controverted by contrary evidence or evidence of bad faith."  *Id.* (citing *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)); *see also Pinson*, 160 F. Supp. 3d at 293 ("Agency affidavits attesting to a reasonable search are afforded a presumption of good faith and can be rebutted only with evidence that the agency's search was not made in good faith." (internal quotation marks and citation omitted)).  "Once an agency has provided such affidavits, the burden shifts back to the plaintiff to demonstrate the lack of a good faith search."  *Marino*, 993 F. Supp. 2d at 9 (citing *Maynard v. CIA*, 986 F.2d 547, 560 (1st Cir. 1993)).

State's declaration from a qualified declarant, *see* Stein Decl. ¶ 1, shows that IPS determined which offices to search based on IPS's familiarity with the request and records systems.  *See* Stein Decl. ¶¶ 9, 11.  IPS specializes in responding to FOIA requests directed at the State Department.  *See* Stein Decl. ¶ 2.  Mr. Stein explained that when the State Department receives a FOIA request, IPS evaluates the request to determine which offices are reasonably likely to contain responsive material based on "a familiarity with the holdings of the Department's record systems, applicable record disposition schedules, and the substantive and functional mandates of numerous Department offices and Foreign Service posts and missions." Stein Decl. ¶ 9.  IPS takes into account the scope of the request itself and any specific places that

the requester identifies.  Stein Decl. ¶ 9.  Once IPS identified the places reasonably likely to contain responsive materials—namely, the Office of the Legal Adviser, the Office of the Executive Secretariat, the Retired Records Inventory Management System, and categories of non-state.gov emails—employees knowledgeable with the relevant document systems conducted searches using a list of terms, almost all of which were agreed upon by the parties.  *See* Stein Decl. ¶¶ 11, 13–15, 18–20, 22, 25–26.  Plaintiff's many objections to State's search—most of which were presented cursorily, *see* Pl.'s Mot. Summ. J. at 9–13—are unavailing.  The Court will address them in turn.

First, Plaintiff argues that State never explained why it was necessary to search both the "state-of-the-art" records management content server—which appears to contain all the potentially-relevant records in the Office of the Legal Adviser—and the individual files of the Assistant Legal Adviser.  *See* Pl.'s Mot. Summ. J. at 10–11.  Plaintiff further argues that State did not explain why it searched the Assistant Legal Adviser's files but not those of other employees.  *Id.* at 11.  However, as State explained in its opposition, the content server is not a repository of *all* records generated within the Office of the Legal Adviser—it only includes files specifically uploaded.  *See* Second Stein Decl. ¶ 4.  Thus, it was reasonable for State to search both the "state-of-the-art" content server and other locations that might reasonably have contained documents that were not uploaded to the content server.  As for how State chose where to search, Mr. Stein explained that, because the Assistant Legal Adviser is "the official[] who manage[s] the Department's ethics program and would have been involved in any determinations relating to the subject FOIA request," IPS determined that the assistant legal adviser and her predecessors' records were reasonably likely to contain responsive materials.  *See* Second Stein Decl. ¶ 2.  Notably, Judicial Watch never responded to State's explanations in its reply.  *See* Pl.'s

Reply Br. Supp. Cross-Mot. Summ. J. ("Pl.'s Reply") at 2–4, ECF No. 34.  The Court finds that

State adequately explained its search of the Office of the Legal Adviser despite Plaintiff's

objections.

Judicial Watch next contends that State never explained why it used different search

terms in searching the content server of the Office of the Legal Adviser as compared to the files

of the Assistant Legal Adviser.  *See* Pl.'s Mot. Summ. J. at 11.  As a baseline, the parties agreed

to the search terms that State used to search the Assistant Legal Adviser files.  *See* Second Stein

Decl. ¶ 5.  As State noted in its reply, the terms used to search the content server were actually

"broader, but no less effective," than the agreed-upon search of the Assistant Legal Adviser files.

*Id.*  Judicial Watch did not respond to State's argument in its reply.  *See* Pl.'s Reply at 2–4.

There is no reason for the Court to believe that a *broader* search than that agreed upon by the

parties would be less likely to produce responsive documents.

Judicial Watch, citing to a 2016 Office of the Inspector General report, further argues that

State never searched its State Messaging and Archive Retrieval Toolset ("SMART") system.[12]

*See* Pl.'s Mot. Summ. J. at 11–12.  Plaintiff describes the system as one that allows "employees

to preserve a record copy of emails through their Department email accounts without having to

file and print them."  *Id.* at 12.  Again in its reply, Defendant established that the SMART system

is a Microsoft Outlook-based "system that allows users to send working emails, record emails,

and cables."  *See* Second Stein Decl. ¶ 8.  Some of the documents that are sent are stored through

---

[12] In one sentence, Plaintiff also argues that State did not explain how its search of the
RIMS system differed from the content-server search.  *See* Pl.'s Mot. Summ. J. at 11.  State went
on to explain that the content server holds only archived material that has been uploaded to the
system, while the RIMS system contains more retired records than the content server.  *See*
Second Stein Decl. ¶ 6.  Plaintiff did not respond to this explanation.  *See* Pl.'s Reply at 2–4.
Accordingly, the Court finds the search reasonable in this respect.

the SMART system, but some are not.  *See id.*  In any case, however, "[r]esponsive records in

this matter would have been generated, received, or communicated" by the relevant offices

searched, and "are not reasonably likely to be of the type that would be found in SMART,

because the employees in the Office of the Secretary did not have access to SMART, and the

relevant employees in [the legal ethics office] . . . did not use SMART."  *See id.*  Judicial Watch

again did not respond to State's explanation in its reply.  *See* Pl.'s Reply at 2–4.  Thus, the Court

concludes that State has met its burden of explaining why it did not conduct a separate search of

the SMART system.

   Plaintiff also argues that Defendant never explained why it did not conduct searches of

the Office of the Secretary.  *See* Pl.'s Mot. Summ. J. at 12.  Defendant responds that the Office

of the Executive Secretariat is the custodian of records for the documents generated by the Office

of the Secretary during the time period of Plaintiff's request.  *See* Second Stein Decl. ¶ 7.

Plaintiff's only response is that this description does not make clear that "Executive Secretariat

records and Secretary's Office records are one and the same."  *See* Pl.'s Reply at 4.  This

response is insufficient.  State need not show that the record systems for the two offices are "one

and the same"—it need only provide sufficient detail to show that they searched all places where

responsive material is reasonably likely to be located.  *See id.*  State did just that: by explaining

that the Executive Secretariat is the custodian of records for the Office of the Secretary's

documents that were generated during the relevant timeframe, State fulfilled its burden of

showing that it searched the relevant locations connected to the Office of the Secretary.  Plaintiff

gives the Court no reason to believe that the current Office of the Secretary would still possess

responsive records, which would necessarily have been generated years ago.  Judicial Watch

does, however, cite to *Judicial Watch v. Department of State*, a 2012 case where State indicated

that it had searched both the Office of the Executive Secretariat and the Office of the Secretary. *See* Pl.'s Reply at 4.  In contrast to the case at bar, there the plaintiff sought records related to actions taken by the Secretary and made the request while she was still in office.  *See generally* Compl., *Judicial Watch v. Dep't of State*, 12-cv-2034 (2012), ECF No. 1.  It would make sense that, in that situation, the Office of the Secretary and the Office of the Executive Secretariat might each have responsive documents when the request sought records of a sitting Secretary rather than an ex-Secretary.

Finally, Plaintiff devotes much of its objection to the search process to its argument that State never explained why it searched the emails of Cheryl Mills and Jacob Sullivan, but not other "key officials," especially Huma Abedin.  Pl.'s Mot. Summ. J. at 12.  State responds that the subject matter of this FOIA request—which concerned potential conflicts of interest between the State Department and the Clinton Foundation—falls outside the scope of other staffers' job responsibilities.  *See* Second Stein Decl. ¶ 7.  Stated differently, the staffers that Plaintiff identifies as potential sources of responsive material are not involved with "State Department review of donations . . . for potential conflicts of interest."  *See id.*; Compl. ¶ 5.  Thus, IPS concluded, it was not reasonably likely that these staffers' emails would have contained responsive materials.  *See* Second Stein Decl. ¶ 7.  Plaintiff, in reply, does not refute State's argument, but contends that Huma Abedin wore "many hats" within the State Department and the Clinton Foundation.  *See* Pl.'s Reply at 2–3.  "Judicial Watch does not argue [that] the search was made in bad faith . . . ."  *Id.* at 2.  Nor does it contend that anyone other than Huma Abedin had any role in the Clinton Foundation, or any specialized ethical training.  *See id.*  Accordingly, State's point with respect to staffers other than Ms. Abedin is well-taken.  However, with respect to Ms. Abedin, State has failed to show that it is not reasonably likely that Ms. Abedin's emails

contain responsive materials.  Although Ms. Abedin did not have any particular ethics training, she was simultaneously involved in both Clinton Foundation and State Department business.  *See* Pl.'s Reply at 2–3.  It is reasonable to expect that someone who had a role in both organizations would discuss the subject matter of potential ethical issues.  Accordingly, the Court will order State to conduct a search of the records turned over by Huma Abedin.

In sum, State's search was reasonable in most respects.  However, Judicial Watch is correct that State should have searched the records produced to the State Department by Ms. Abedin, so the Court will order State to do so.

## B.  Deliberative Process Privilege

State contends that of the 16 responsive documents, ten total—five in part, five in whole—are exempt from disclosure under the deliberative process privilege.  *See* Def.'s Mot. Summ. J. at 6.  Judicial Watch responds that the deliberative process privilege does not apply to officials and employees who have not yet been confirmed by the Senate or formally taken office. *See* Pl.'s Mot. Summ. J. at 4.  Judicial Watch further argues that State improperly redacted the reasonably segregable identities of groups for potential speeches, potential Clinton Foundation sponsors, and a potential consulting client.  *See id.* at 4–6.  State responds by arguing that the deliberative process privilege does apply to potential officials and employees who act as consultants, and that the redacted identities fall within the scope and purpose of the privilege, because revealing those identities would have a chilling effect on ethical deliberations.  *See* Def.'s Reply at 10–13.

The Court "'impose[s] a substantial burden on an agency seeking to avoid disclosure' through the FOIA exemptions."  *Morley*, 508 F.3d at 1114 (alteration in original) (quoting *Vaughn v. Rosen,* 484 F.2d 820, 828 (D.C. Cir. 1973)).  Accordingly, disclosure exemptions are

"narrowly construed," and "'conclusory and generalized allegations of exemptions' are unacceptable." *See id.* at 1114–15 (quoting *Founding Church of Scientology of Wash., D.C., Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 830 (D.C. Cir. 1979)).  However, courts generally respect the factual reasoning of agencies, and "[u]ltimately[] an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'"  *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)).  Thus, "a reviewing court should 'respect the expertise of an agency' and not 'overstep the proper limits of the judicial role in FOIA review.'"  *Pinson*, 160 F. Supp. 3d at 293 (quoting *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979)).  In claiming exemptions, a government agency must explain its reasoning in such a manner as "to permit adequate adversary testing of the agency's claimed right to an exemption, and enable the . . . [c]ourt to . . . rational[ly] deci[de] whether the withheld material must be produced without actually viewing the documents themselves," and "without thwarting the [claimed] exemption's purpose." *King v. U.S. Dep't of Justice*, 830 F.2d 210, 218–19, 224 (D.C. Cir. 1987) (quotation marks omitted).

Exemption 5 under FOIA protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency" from disclosure.  5 U.S.C. § 552(b)(5).  Broadly, Exemption 5 covers documents that could be withheld by parties in litigation pursuant to evidentiary privileges.  *Williams & Connolly v. S.E.C.*, 662 F.3d 1240, 1243 (D.C. Cir. 2011).  One such privilege is the deliberative process privilege, *id.*, which protects "confidential intra-agency advisory opinions and materials reflecting deliberative or policy-making processes." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004) (quotation marks omitted) (citing *Envtl. Prot. Agency v. Mink*, 410 U.S. 73, 86, 89 (1973)).  To qualify for the privilege, the agency must show that the

information contained within the document is both "predecisional" and "deliberative." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d at 1113.  A document is "predecisional if it was generated before the adoption of an agency policy." *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 874 (D.C. Cir. 2009) (quoting *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 151 (D.C. Cir. 2006)).  It is deliberative "if it reflects the give-and-take of the consultative process." *Pub. Citizen, Inc.*, 598 F.3d at 874 (quoting *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d at 151).  That means that the document must "reflect the personal opinions of the writer rather than the policy of the agency." *Morley*, 508 F.3d at 1127 (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). Factual material can only be withheld if its release would inevitably reveal the deliberative process of the agency.  *See Pub. Citizen, Inc.*, 598 F.3d at 876; *Morley*, 508 F.3d at 1127.  Thus, the deliberative process privilege cannot be used as a sword for agencies to withhold underlying factual material that would not reveal the agency's internal deliberative process.  *See Morley*, 508 F.3d at 1127.

The Court will first address the deliberative process privilege issue as it relates to the withheld documents related to former-Secretary Clinton's Senate confirmation hearings, then turn to the documents that Judicial Watch contends contain reasonably segregable facts.

### 1.  Documents Related to Senate Confirmation Hearings

State withheld six documents related to Senate confirmation hearings, five[13] of which relate to then-Senator Clinton's confirmation specifically.  *See* Stein Decl. ¶¶ 34, 36–38, 42–43. Judicial Watch contends that these documents cannot be withheld because they did not relate to a

---

[13] As noted above in note 11, one document apparently concerns pre-hearing questions submitted by Senator Lugar to Mr. Koh.

State Department policy or decision and were, in at least some cases, generated between persons

who were not employed by or consulting with the State Department.  *See* Pl.'s Mot. Summ. J. at

3–4.  State responds that these communications were made by the equivalent of State

Department consultants, and pertained to the Department's decision-making process.  *See* Def.'s

Reply at 10–13.

 Although a strict reading of the deliberative process privilege would include only

documents exchanged between employees of federal agencies, the D.C. Circuit has adopted "a

more functional approach" to the exemption.  *Judicial Watch, Inc. v. U.S. Dep't of Transp.*, 950

F. Supp. 2d 213, 216 (D.D.C. 2013).  This approach looks to the purpose of the deliberative

process privilege, which is "to promote the quality of agency policy decisions."  *Id.*  In line with

that purpose, the D.C. Circuit has applied the exemption to cases where outside experts are

consulted for their advice on agency decisions.  *See id.*  "While such a rendering departs from the

general rule that courts should construe FOIA exemptions narrowly, it best captures the

exemption's purpose of protecting the government's deliberative process when that process

involves outsiders."  *Id.* (citing *Dep't of Justice v. Julian*, 486 U.S. 1, 18 n. 1 (1988) (Scalia, J.,

dissenting)).  In *Ryan v. Department of Justice*, the plaintiff sought disclosure of questionnaires

that the Attorney General sent to United States Senators, seeking their input for the selection of

judicial nominees.  *See* 617 F.2d 781, 784 (D.C. Cir. 1980).  In finding that the questionnaires

constituted intra-agency memoranda, the Court held that "[w]hen an agency record is submitted

by outside consultants as part of the deliberative process, and it was solicited by the agency, . . .

it [is] entirely reasonable to deem the resulting document to be . . . 'intra-agency.'"  *Id.* at 790.

Importantly, the exemption does not apply to agency deliberations between the agency and an

outsider for the purpose of the outsider's decision-making process; it applies only "[w]hen

communications between an agency and a non-agency aid *the agency's* decision-making process." *Judicial Watch, Inc. v. U.S. Dep't of Transp.*, 950 F. Supp. 2d at 218–19 (emphasis added).

Judicial Watch raises serious questions as to whether the documents withheld by State relating to officials' nominations fall within the scope of the deliberative process privilege. The first six documents[14] withheld concern confirmation hearings, which, by definition, occurred prior to officials assuming their positions at the State Department. *See* U.S. Const. art. II § 2. They were communications made by and to potential State Department officials and nominees as advice for Senate confirmation hearings. The first document withheld was a draft document from then-Senator Clinton to a State Department ethics attorney regarding her ethical obligations were she to be confirmed by the Senate. *See* Stein Decl. ¶ 34. The second and third documents are forwarded emails containing an email exchange between Cheryl Mills, who was not a State Department employee at the time, and then-Senator Clinton, and an email exchange between Jacob Sullivan and Philippe Reines, neither of whom were State Department employees at the time. *See* Stein Decl. ¶¶ 36–37. The fourth withheld document was a revised version of the talking points contained in the second and third documents, which concerned potential ethical considerations in then-Senator Clinton's Senate confirmation hearings. *See* Stein Decl. ¶¶ 36, 38. The fifth and sixth withheld documents contain questions and proposed answers for officials during their confirmation hearings. *See* Stein Decl. ¶¶ 42–43.

State has not adequately responded to Judicial Watch's legal contentions. Specifically, State does not adequately address whether, in its legal opinion, the subject-matter of these

---

[14] Identified by State as C05867882, C05892232, C05892233, C05892234, C05892235, and C05892237. *See* Stein Decl. ¶¶ 34, 36–38, 42–43.

documents can fairly be said to relate to State Department policies and goals.  The documents

primarily relate to then-Senator Clinton's Senate confirmation hearings, many of them

promulgated for the purpose of informing then-Senator Clinton's answers during her

confirmation hearings.  The Court queries whether the issues a prospective official is facing in

her pursuit of public office fall within the gamut of an *agency's* policies such that deliberation of

them is shielded by Exemption 5.  Accordingly, the Court will deny the cross-motions for

summary judgment, but allow the parties to move for renewed motions for summary judgment

after they are able to more fully brief the issue.  The parties may also further supplement the

factual record to provide context to these documents so that the Court may have a more clear

understanding of whether the deliberative process privilege—or any other FOIA exemption—

applies.

### 2.  Potentially Segregable Information

Judicial Watch also contends that the identities of certain potential sources of conflict

being deliberated upon are reasonably segregable from the withheld documents.  Judicial Watch

argues that the following information should be disclosed: the identities of (1) the group for a

potential speech by former-Secretary Clinton, (2) two potential sponsors of the Clinton

Foundation, (3) the foreign government offering to sponsor an event featuring former-President

Bill Clinton, and (4) a potential consulting client for former-President Bill Clinton.  *See* Pl.'s

Mot. Summ. J. at 5–6.  Plaintiff maintains that State need only release "single words or names,"

or "potentially, just the subject lines of the emails" to comply with FOIA.  *See id.* at 6.  State

responds that the release of factual materials can often reveal the underlying deliberations of the

agency, and that release of these identities would "discourage candid discussion."  *See* Def.'s

Reply at 11.  In essence, State argues that the disclosure of the subject of ethical deliberations would have chilling effects on the deliberations themselves.  *See id.* at 12–13.

It is true that the release of materials labeled as "factual" can "occasionally reveal much about [the deliberative] process" of an agency.  *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987).  However, it is also true that "[t]he release of materials plausibly labeled 'deliberative' will occasionally reveal nothing about an agency's decisionmaking process."  *Id.*  As a result, courts must "focus less on the nature of the materials sought and more on the effect of the materials' release: the key question in [deliberative process privilege] cases [is] whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions."  *Id.*  "[I]f a person requests particular factual material . . . the agency will usually be able to excise the material . . . and disguise the material's source, and thus the agency will usually be able to release the material without disclosing any deliberative process."  *Id.* at 1569.  To determine whether release of the information would reveal the agency's deliberative process, the Court must determine "whether the factual material 'bear[s] on the formulation or exercise of agency policy-oriented *judgment*.'"  *Edmonds Inst. v. U.S. Dep't of Interior*, 460 F. Supp. 2d 63, 70 (D.D.C. 2006) (alteration in original) (quoting *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992)).

State's conclusory argument that, at times, factual material can reveal an agency's deliberative process does not show that it would in this case.  Nor does State's chilling-effect argument hold water.  Although it may be true that the possible revelation of the sources of ethical questions may have a chilling effect on employees' willingness to bring those questions

to the Department, it would not have chilling effects on the Department's deliberation about them. Presumably, when presented with such a potential conflict, State has a duty to assess the conflict; it cannot be chilled from doing so. Judicial Watch seeks only certain raw factual information that the State Department deliberated upon; there is nothing about the *sources* of potential ethical conflicts that would chill ethics lawyers' candid discussion of them. State does not argue that either the submitter of the ethics inquiry or the third party subject to that inquiry has a privacy interest in not having his or her potential speech or action disclosed. Taken to its logical extreme, State's argument would justify the shielding of all factual material that is the subject of deliberation by agency officials. Accordingly, State must release the identities of: (1) the group for the potential speaking engagement for former-Secretary Clinton in Document C05880711, (2) the potential sponsors in Document C05867888, (3) the foreign government in Document C05867890, and (4) the potential consulting client in Document C0586776. *See* Stein Decl. ¶¶ 35, 39–41.

## C. Withholding based on Personal Privacy

State further contends that private email addresses contained in three documents are exempt from disclosure because release would constitute an unwarranted invasion of the personal privacy of the owners of the addresses, and disclosure of the addresses could lead to harassment. *See* Def.'s Mot. Summ. J. at 12; Def.'s Reply at 15. Judicial Watch argues that the withheld email addresses—which were apparently used by Hillary Clinton, Cheryl Mills, Phillipe Reines, and Jacob Sullivan prior to their employment with the State Department—in two[15] partially-redacted documents that relate to then-Senator Clinton's nomination would shed

---

[15] Judicial Watch did not challenge State's redaction of email addresses contained within Document C05867776 in its motion for summary judgment. *See* Pl.'s Mot. Summ. J. at 6–9 ("Plaintiff challenges Defendant's b(6) withholdings of private email addresses used by

light on how private email accounts were used in connection with official State Department business.  *See* Pl.'s Mot. Summ. J. at 6–7.  This, they argue, makes the public's interest in the email addresses "enormous."  *See id.* at 7.  State responds that none of the redacted private email addresses were from the domain extension "@clintonemail.com," and that they disclosed the identities of the individuals whose private email addresses contained the domain extensions "@hillaryclinton.com" and "@clinton.senate.gov," which fulfills the public's interest in the information without opening the individuals up to "unsolicited attention and harassing inquiries."  *See* Def.'s Reply at 14–15.  Judicial Watch, in reply, argues that the public still has an interest in knowing what email addresses were used, and that the State Department should, at a minimum, release the domain extensions of the redacted addresses.  *See* Pl.'s Reply at 10–11.

There is, however, a problem with Judicial Watch's suggestion that State release the domain extensions of the redacted email addresses: in one of the documents, State released the email prefixes but redacted the domain extensions.  *See id.* at 11.  Thus, if State were to re-release the documents with the prefixes redacted but the extensions released, a keen observer could piece together the redacted documents to ascertain the full email addresses.  This problem does not extend to the other partially-withheld document that Judicial Watch challenges.

FOIA exempts "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).

---

government employees in Documents C05892232 and C05892233, described in Defendant's narrative *Vaughn* index at paragraphs 36–37.").  In its reply—which is the final filing on these motions—Judicial Watch asked the Court to order the release of a redacted email address in Document C05867776.  *See* Pl.'s Reply. Br. Supp. Cross-Mot. Summ. J. at 11, ECF No. 34.  Because this issue was not properly raised, the Court will deny Plaintiff's request.  *See Walker v. Pharm. Research & Mfrs. of Am.*, 461 F. Supp. 2d 52, 58 n.9 (D.D.C. 2006) ("Because the plaintiff only addresses this particular claim in her reply to the motion . . ., the plaintiff has waived the argument.").

This exception also protects "bits of personal information, such as names and addresses, the release of which would create a palpable threat to privacy."  *See Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015) (alteration and quotation marks omitted).  These "bits of information" are protected only if they "can be identified as applying to that individual."  *See U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982) (citing H.R. Rep. No. 1497, 89th Cong., 2nd Sess., 11 (1966), *as reprinted in* 1966 U.S.C.C.A.N. 2418, 2428); *accord Gov't Accountability Project v. U.S. Dep't of State*, 699 F. Supp. 2d 97, 106 (D.D.C. 2010) ("Because those email addresses can be identified as applying to particular individuals, they qualify as 'similar files' under Exemption 6 . . . .").  "[U]nder Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act."  *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 261 (D.C. Cir. 1982).  To determine whether disclosure is warranted, the court must first determine "whether the third[]party has more than a *de minimis* privacy interest in the requested material."  *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 840 F. Supp. 2d 226, 231 (D.D.C. 2012) (citing *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 12 (D.C. Cir. 2011)).  "If such an interest exists, the court must then determine whether the third[]party's privacy interest is outweighed by the public interest in disclosure."  *Id.* (citing *ACLU*, 655 F.3d at 6).  The case law is clear that there is a substantial privacy interest in full email addresses.  *See, e.g.*, *Gov't Accountability Project*, 699 F. Supp. 2d at 106.

Because Judicial Watch does not dispute that disclosure of the email addresses would trigger a substantial—in other words, more than a *de minimis*, *see ACLU*, 655 F.3d at 12 n.17—privacy interest, *see* Pl.'s Mot. Summ. J. at 6–7; Pl's Reply at 10–11, the issue before the Court is whether the third-party privacy interests of the owners of the addresses are outweighed by the

public's interest in the information.  In general, the public has an interest in information

concerning what the agency is "up to."  *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999)

(quoting *U.S. Dep't of Def. v. FLRA*, 510 U.S. 487, 497 (1994)).  Accordingly, the public does

not have an interest in "[i]nformation that 'reveals little or nothing about an agency's own

conduct.'"  *Beck v. Dep't of Justice*, 997 F.2d 1489, 1493 (D.C. Cir. 1993) (quoting *U.S. Dep't of

Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 773 (1989)).  Courts have

upheld agency withholding of private email addresses because they typically do not reveal

anything about what the agency is "up to," and constitute "clearly unwarranted invasion[s] of

privacy."  *See, e.g.*, *Gov't Accountability Project*, 699 F. Supp. 2d at 106.

The public does not have a significant interest in the email addresses contained within the

redacted emails.  Judicial Watch freely admits—even highlights—that these emails were used

*before* the users were employed at the State Department.  *See* Pl.'s Mot. Summ. J. at 6–7.

Judicial Watch does not establish any connection between the use of private email servers by

prospective employees—who, presumably, did not even have a state.gov email address—and use

of private email servers while in office.  Although it is true that members of the State Department

appear to have been included in this communication in some way and thus "reviewed" the

content as specified by Plaintiff's FOIA request, Judicial Watch does not respond to Mr. Stein's

declaration that revealing the identities of the private emails "would shed no light on the conduct

of U.S. Government business" with respect to that review.  *See* Stein Decl. ¶¶ 37–38.  Given the

context of the documents, the Court has no reason to question his assertion.  The mere use of

private email addresses by outsiders of the State Department does not show much of anything,

much less a pattern.  Moreover, even if Judicial Watch were correct that use of former-Secretary

Clinton's servers before she took office would shed light on the use of these addresses by other

State Department employees, State has shown that these emails were not sent from

clintonemail.com.  *See* Second Stein Decl. ¶¶ 9–10.  In contrast, the disclosure of such emails

would constitute a "clearly unwarranted invasion of privacy."  *See Gov't Accountability Project*,

699 F. Supp. 2d at 106.

Mere domain extensions, however, do not trigger a substantial third-party privacy

interest.  State predicates its privacy argument on the potential for harassment against individuals

should their private email addresses be released to the public.  *See* Def.'s Mot. Summ. J. at 12;

Def.'s Reply at 15.  This argument is salient with respect to full email addresses, which could be

used by members of the public to harass the owner of the address.  Moreover, because

Exemption 6 protects the privacy interests of third parties, State's previous decision to release

the email prefixes alone cannot waive the privacy interests of those third parties.  State does not

show, however, that the email domain extensions contained within the document where the email

prefixes are still redacted are the types of "bits of information" that "can be identified as

applying to that individual," any more than the redactions themselves can be attributed to the

unredacted identities of the authors.  There is no suggestion by Mr. Stein, for example, that the

particular domain extensions would reveal anything substantial about the already-apparent

owners of the addresses.  In light of the strong presumption in favor of disclosure, the Court will

order the release of email domain extensions that, based on previous releases, could not be used

to infer the full email addresses in Documents C05892232 and C05892233, but grant State's

motion for summary judgment on the basis of withholding for personal privacy in all other

respects.

## V.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiff's cross-motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 2, 2017                                      RUDOLPH CONTRERAS
                                                             United States District Judge