# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil Action No.:    15-688 (RC) |
| v. | : | |
| | : | Re Document Nos.:    41, 42 |
| U.S. DEPARTMENT OF STATE, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT; DENYING PLAINTIFF'S RENEWED CROSS-MOTION FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Neither Plaintiff Judicial Watch nor Defendant U.S. Department of State ("State") is a stranger to litigation regarding whether emails authored by Hillary Clinton and her associates during her tenure as Secretary of State are subject to disclosure under the Freedom of Information Act ("FOIA").[1]  This case, now before the Court on renewed cross-motions for summary judgment, presents a different twist on that familiar theme:  Judicial Watch seeks documents that address potential conflicts of interest between State and The William J. Clinton Foundation, including six records generated in the course of preparing not-yet-Secretary Clinton and a prospective State Department Legal Adviser for their respective Senate confirmation hearings.  Citing the deliberative process privilege, State refuses to disclose the records.  As explained below, the Court concludes that all six disputed documents are properly withheld

---

[1]  *See, e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of State*, 282 F. Supp. 3d 36 (D.D.C. 2017); *Judicial Watch, Inc. v. U.S. Dep't of State*, 272 F. Supp. 3d 88 (D.D.C. 2017); *Judicial Watch, Inc. v. U.S. Dep't of State*, 235 F. Supp. 3d 310 (D.D.C. 2017).

under FOIA Exemption 5.  Accordingly, the Court grants State's renewed motion for summary

judgment and denies Judicial Watch's motion for the same.[2]

## II.  FACTUAL BACKGROUND

In March 2015, Judicial Watch submitted a FOIA request to State, seeking "[a]ny and all

records that identify the policies and/or procedures in place to ensure that former Secretary of

State Hillary Rodham Clinton's personal or charitable financial relationships with foreign

leaders, foreign governments, and business entities posed no conflict of interest to her role as

Secretary of State."  Compl. ¶ 5, ECF No. 1.  Judicial Watch also requested "[a]ny and all

records concerning, regarding, or related to State Department review of donations to the Clinton

Foundation for potential conflicts of interest with former Secretary Clinton's role as Secretary of

State."  Compl. ¶ 5.  Plaintiff confined its request to records generated between January 1, 2009

and January 31, 2013.  Compl. ¶ 5.  Finding State's response to the requests inadequate in

several respects, Judicial Watch filed the present lawsuit.  With Judicial Watch's suit pending,

State announced that it had completed its records search and that its search had yielded sixteen

responsive documents.  *See* Decl. of Eric F. Stein ("First Stein Decl.") ¶ 6, ECF No. 28-2.  Of the

sixteen documents, State released six documents but withheld—in part or in full—the other ten

documents.  First Stein Decl. ¶ 6.

---

[2]  Judicial Watch also initially requested the domain extensions of certain private email
addresses that are included in two of the records.  State has withheld them, contending that
disclosure would unjustifiably invade the personal privacy of the individuals to whom the email
addresses belong.  Because Judicial Watch has since abandoned its challenge to those
withholdings and because, in any event, the Court concludes that State has shown that FOIA
Exemption 6 protects the email domain extensions, the Court also enters summary judgment for
State regarding those withholdings.

Six of the withheld records had been originally generated by non-State employees in the course of preparing Clinton—at the time, nominee for Secretary of State—and prospective State Department Legal Adviser Harold Hongju Koh for their respective Senate confirmation hearings. *See* First Stein Decl. ¶¶ 34, 36, 43.  Document C05867882 in an undated two-page draft letter from not-yet-Secretary Clinton to Deputy Legal Adviser and Designated Agency Ethics Official James Thessin regarding the Secretary's "ethics undertakings," if she were to be confirmed as Secretary of State.  *See* Third Decl. of Eric F. Stein ("Third Stein Decl.") ¶ 4, ECF No. 41-2.  A final version of that document was released to Judicial Watch.  Third Stein Decl. ¶ 4.  Document C05892232 is a five-page email exchange from Clinton's Deputy Chief of Staff Jacob Sullivan to Assistant Secretary of State for Legislative Affairs Richard Verma, dated April 20, 2009, forwarding a January 13, 2009, message from Cheryl Mills to Clinton that contains proposed talking points for addressing ethical considerations in Clinton's Senate confirmation hearing. Third Stein Decl. ¶ 5.  The contents of the underlying message had been forwarded to Verma for consideration for use in preparation for another nominated individual's Senate confirmation hearing for a Department position.  First Stein Decl. ¶ 36.  Document C05892233 is a five-page email exchange from Sullivan to Verma, dated April 20, 2009, forwarding a January 12, 2009 message from Sullivan to Clinton's Senior Advisor Philippe I. Reines.  Third Stein Decl. ¶ 6. The underlying message circulated for comments proposed talking points for addressing the ethical considerations that are contained in Document C05892232.  Third Stein Decl. ¶ 6.  The message was forwarded to Verma for consideration for use in preparing for another nominated individual's confirmation hearing for a State position.  First Stein Decl. ¶ 37.  Document C05892234 is an undated four-page document that contains a revised version of proposed talking points for addressing ethical considerations that are contained in documents C05892232 and

C05892233.  Third Stein Decl. ¶ 7.  Document C05892235 is an eight-page document dated

January 12, 2009, which contains nine questions for the record from former Senator Russ

Feingold for Clinton relating to her confirmation hearing as Secretary of State and Clinton's

proposed responses to the questions.  Third Stein Decl. ¶ 8.  Finally, Document C05892237 is an

undated sixty-five page document that contains forty pre-hearing questions submitted by Senator

Richard Lugar for Legal Advisor-Designate Koh and Koh's proposed responses.  Third Stein

Decl. ¶ 9.

In mid-2016, the parties each moved for summary judgment.  *See* Def.'s Mot. Summ. J.,

ECF No. 28; Pl.'s Cross-Mot. Summ. J., ECF No. 29.  The original round of summary judgment

briefing raised questions about the adequacy of State's search; the propriety of State's decision to

withhold under FOIA Exemption 5 records that were generated in preparing the nominees for

their confirmation hearings; whether certain disputed documents included reasonably segregable

factual information that is subject to release; and whether State had properly withheld under

FOIA Exemption 6 private email addresses contained in responsive documents.

First, the Court concluded that State had conducted a search that was, in most respects,

adequate.  *Judicial Watch, Inc. v. U.S. Dep't of State* ("*Judicial Watch I*"), No. 15-cv-688, 2017

WL 456417, at *5–8 (D.D.C. Feb. 2, 2017).  However, the Court ordered State to search records

turned over by Huma Abedin, a key official who was simultaneously involved in Clinton

Foundation and State Department business.  *Id.* at *8.

Next, the Court addressed State's withholdings.  With respect to State's invocation of

FOIA Exemption 5's deliberative process privilege to shield six records developed in preparation

for the confirmation hearings, the Court found that State had not adequately tackled in its

submissions whether the documents related to any State Department policies and goals.  *Id.* at

*10. The Court questioned "whether the issues a prospective official is facing in her pursuit of public office fall within the gamut of an *agency's* policies such that deliberation of them is shielded by Exemption 5." *Id.* (emphasis in original). Accordingly, the Court denied both parties' motions for summary judgment, but permitted the parties to renew their motions. *Id.* The Court asked that the parties' renewed motions more fully brief the issue of State's policy interests in such matters and that, if warranted, the briefing should supplement the factual record with context that might assist the Court in assessing whether any FOIA exemptions apply. *Id.*

Regarding the purported segregablility of factual information in the challenged documents, the Court agreed with Judicial Watch that certain information was subject to release. *Id.* Finally, addressing the parties' dispute about whether State had properly withheld email addresses, the Court explained that while individuals have substantial privacy interests that militate against disclosure of their full email addresses, the domain extensions of private email addresses do not trigger considerable privacy interests. *Id.* at *11. Accordingly, the Court ordered State to release "email domain extensions that, based on previous releases, could not be used to infer the full email addresses." *Id.*

Since the Court issued its prior Opinion, State has conducted a search of Ms. Abedin's records and has produced responsive documents to Judicial Watch's satisfaction. Mem. Supp. Def.'s Renewed Motion Summ. J. ("Def.'s Renewed MSJ") at 3 n.5, ECF No. 41-1; Pl.'s Mem. L. Opp'n Def.'s Renewed Mot. Summ. J. & Supp. Pl.'s Second Cross-Mot. Summ. J. ("Pl.'s Renewed MSJ") at 1, ECF No. 42-1. A live controversy remains, however, regarding the six documents—marked C05867882, C05892232, C05892233, C05892234, C05892235, and C05892237—that relate to the Clinton and Koh Senate confirmation hearings. State renews its claim that these documents are properly shielded by FOIA Exemption 5. *See* Def.'s Renewed

MSJ at 4–8.  Unsurprisingly, Judicial Watch again disputes that contention.  *See* Pl.'s Renewed

MSJ at 3–6.  In addition, State asserts that it has determined that none of the redacted email

domain extensions can be released because, based on State's prior releases, this information

could be used to infer the full email addresses, compromising the privacy of the individuals to

whom the email addresses belong.  *See* Def.'s Renewed MSJ at 8–10.  Judicial Watch initially

objected to State's withholding of the email domain extensions, but it has since abandoned any

challenge to State's refusal to release this information.  *See* Pl.'s Reply Supp. Second Cross-Mot.

Summ. J. ("Pl.'s Reply") at 2, ECF No. 46.  Having inspected the disputed documents *in camera*,

the Court takes up the parties' renewed cross-motions.

## III.  LEGAL STANDARD

FOIA "sets forth a policy of broad disclosure of Government documents in order 'to

ensure an informed citizenry, vital to the functioning of a democratic society.'"  *FBI v.

Abramson*, 456 U.S. 615, 621 (1982) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S.

214, 242 (1978)); *see also Judicial Watch v. U.S. Dep't of Defense*, 847 F.3d 735, 738 (D.C. Cir.

2017) ("Congress enacted FOIA to given the public 'access to official information long shielded

unnecessarily from public view.'").  The Act mandates release of properly requested federal

agency records, unless the materials fall squarely within one of nine statutory exemptions.

*Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011); *Students Against Genocide v. Dep't of State*,

257 F.3d 828, 833 (D.C. Cir. 2011) (citing 5 U.S.C. § 552(a)(3)(A), (b)).

"FOIA cases typically and appropriately are decided on motions for summary judgment."

*Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing

*Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007)).  The agency is

entitled to summary judgment if no material facts are genuinely in dispute and the agency

demonstrates "that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Competitive Enter. Instit. v. EPA*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017). "This burden does not shift even when the requester files a cross-motion for summary judgment because 'the Government ultimately has the onus of proving that the documents are exempt from disclosure,' while the 'burden upon the requester is merely to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" *Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (brackets omitted) (quoting *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)).

To carry its burden, the agency must provide "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of the withheld document to which they apply." *Elec. Privacy Info. Ctr. v. U.S. Drug Enf't Agency*, 192 F. Supp. 3d 92, 103 (D.D.C. 2016) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977)). In conducting its review, a court may also rely on its own *in camera* examination of disputed documents to determine whether they were properly withheld under the claimed statutory exemptions. *See* 5 U.S.C. § 552; *see also, e.g.*, *Citizens for Responsibility & Ethics in Wash. v. Nat'l Archives & Records Admin.*, 715 F. Supp. 2d 134, 140–42 (D.D.C. 2010) (relying on the Court's *in camera* review to resolve whether documents had been properly withheld). A court will endorse an agency's decision to withhold records if the agency's justification for invoking a FOIA exemption "appears 'logical' or 'plausible.'" *Pinson v. U.S. Dep't of Justice*, 245 F. Supp. 3d 225, 239 (D.D.C. 2017) (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)). Nonetheless, "exemptions from disclosure must be narrowly construed . . . and conclusory and

generalized allegations of exemptions are unacceptable." *Morley v. CIA*, 508 F.3d 1108, 1114–15 (D.C. Cir. 2007) (citation and internal quotation marks omitted).

# IV.  ANALYSIS

The present round of summary judgment briefing presents two issues: (1) whether State properly invoked FOIA Exemption 5 to justify withholding six disputed records, all of which were originally generated by non-State employees in the course of preparing Secretary of State nominee Clinton and Legal Adviser-Designate Koh for their respective confirmation hearings; and (2) whether State has demonstrated that FOIA Exemption 6 shields the domain extensions of private email addresses that appear in responsive records.  As explained below, the Court is convinced that State has successfully discharged its FOIA obligations and, accordingly, the Court will enter summary judgment in State's favor.

## A.  Records Withheld Under FOIA Exemption 5

State contends that it has properly withheld six disputed records pursuant to FOIA Exemption 5's deliberative process privilege.  The Court agrees.  The Court sets out the legal standard for applying FOIA Exemption 5 to records produced or distributed by non-agency personnel then applies that standard to the disputed documents.

### 1.  Legal Standard

FOIA Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency."  5 U.S.C. § 552(b)(5).  Thus, "[t]o qualify, a document must . . . satisfy two conditions: its sources must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it."  *Dep't of Interior*

*v. Klamath Water Users Protective Ass'n* ("*Klamath*"), 532 U.S. 1, 8 (2001).  Focusing primarily

on the first condition, the Court describes each requirement below.

### a. "Inter-Agency or Intra-Agency"

FOIA defines "agency" as "any executive department, military department, Government

corporation, Government controlled corporation, or other establishment in the executive branch

of the Government (including the Executive Office of the President), or any independent

regulatory agency."  5 U.S.C. § 552(f)(1).  However, precedents of the Supreme Court and the

D.C. Circuit clarify that, in at least some circumstances, a record need not necessarily be

addressed both to and from employees of a single agency to qualify as "intra-agency" and need

not necessarily be exchanged among two entities defined as agencies under FOIA to qualify as

"inter-agency."  Like several other Circuits, the D.C. Circuit has embraced a functional approach

wherein FOIA Exemption 5 can apply to certain communications between individuals within an

agency and non-agency personnel.  *See Klamath*, 532 U.S. at 9–10 (explaining that several

circuits have adopted a functional approach to the "intra-agency" requirement); *Nat'l Inst. of*

*Military Justice v. U.S. Dep't of Defense* ("*NIMJ*"), 512 F.3d 677, 679–86 (D.C. Cir. 2008)

(describing the D.C. Circuit's early embrace of a functional approach to the "intra-agency"

requirement and affirming the continued validity of such an approach post-*Klamath*).

First, under what has become known as the "consultant corollary," records exchanged

between an agency and outside consultants qualify as "intra-agency" for purposes of Exemption

5 if (1) the agency solicited the records from the non-agency party or there exists "some indicia

of a consultant relationship between the outsider and the agency," *see NIMJ*, 512 F.3d at 686–87

(describing the circumstances in past cases that established the existence of a consultant

relationship between the agency and the outside party), and (2) the records were "created for the

purpose of aiding the *agency's* deliberative process." *Pub. Citizen v. Dep't of Justice*, 111 F.3d 168, 170 (D.C. Cir. 1997) (emphasis in original) (quoting *Dow Jones & Co. v. Dep't of Justice*, 917 F.2d 571, 575 (D.C. Cir. 1990)); *see also Ryan v. Dep't of Justice*, 617 F.2d 781, 790 (D.C. Cir. 1980) ("When an agency record is submitted by outside consultants as part of the deliberative process, and it was solicited by the agency, we find it entirely reasonable to deem the resulting document to be an 'intra-agency' memorandum for purposes of determining the applicability of Exemption 5."). This approach recognizes that "federal agencies occasionally will encounter problems outside their ken, and it clearly is preferable that they enlist the help of outside experts skilled at unravelling their knotty complexities." *Formaldehyde Inst. v. Dep't of Health & Human Servs.*, 889 F.2d 1118, 1122 (D.C. Cir. 1989) (quoting *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1162 (D.C. Cir. 1987)). Applying the consultant corollary, the D.C. Circuit has found that Exemption 5 protected, among other things, questionnaire responses sent by members of the Senate to the Attorney General regarding how the Senators chose whom to recommend for district court judgeships, *Ryan*, 617 F.2d 781 (D.C. Cir. 1980); a rejection letter and comments by a journal's reviewers sent to scientists at the Department of Health and Human Services explaining why an article that the scientists had submitted for publication had not been selected, *Formaldehyde Inst.*, 889 F.2d 1118; and letters sent by former Presidents Reagan and Bush to the National Archives and Records Administration regarding access to their presidential papers, *Pub. Citizen, Inc. v. DOJ*, 111 F.3d 168 (D.C. Cir. 1997).

In *Department of Interior v. Klamath Water Users Protective Association*, the Supreme Court added some flesh to the consultant corollary's bones, clarifying that an outside party is not acting as a consultant for the purposes of Exemption 5 when it "represent[s] an interest of its own, or the interest of any other client." *Klamath*, 532 U.S. at 11. The non-agency actor must

seek to advise the *agency* that hired it. *See id.* at 11. ("Its only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do.").  Declining to explicitly endorse or to define the exact parameters of the consultant corollary, *see id.* at 12 n.4, the Supreme Court explained that "the intra-agency condition excludes, at the least, communications to and from an interested party seeking a Government benefit at the expense of other applicants." *Id.*  Since *Klamath*, the D.C. Circuit has affirmed the validity of pre-*Klamath* Circuit precedents interpreting the consultant corollary. *See NIMJ*, 512 F.3d at 684.  The Circuit has also demarcated some additional boundaries, explaining that the consulting relationship need not be mandated by statute, intimating that an agency's general call to the public for advice would not suffice to establish a consulting relationship, and eschewing any requirement that a consultant must be paid or must serve on an officially-convened committee. *NIMJ*, 512 F.2d at 681, 686–87.  Most centrally, the Circuit has highlighted that "what matters is the nature of the relationship between the consultant and the agency, not the formalities observed." *Id.* at 687.  It has also emphasized that a record must be created in service of the agency's deliberative process.  Thus, the consultant corollary does not apply where an agency has finished deliberating, *see, e.g.*, *Dow Jones & Co., Inc.*, 917 F.2d at 574, and it does not apply when deliberations concern a policy decision to be made by the outsider, not by the agency, *see, e.g.*, *Physicians Comm. for Responsible Med. v. Nat'l Insts. of Health*, 326 F. Supp. 2d 19, 27–29 (D.D.C. 2004) (finding that the consultant corollary did not apply to a grant application submitted by a non-agency-employee scientist to an agency to procure funding for the scientist's work because the record was submitted to advance the scientist's interests not those of the agency).

Separate from the consultant corollary, the Circuit has embraced application of Exemption 5 where an agency has withheld records it sent to or received from non-agency Executive Branch entities that advise and assist the President. In *Judicial Watch, Inc. v. U.S. Department of Energy*, FOIA requesters sued various agencies, arguing that the agencies had violated the disclosure requirements of FOIA by withholding agency records related to the National Energy Policy Development Group ("NEPDG"), an entity created to advise and assist the President on national energy policy. 310 F. Supp. 2d 271, 312–13 (D.D.C. 2004), *aff'd in part and rev'd in part*, *Judicial Watch, Inc. v. Department of Energy*, 412 F.3d 125 (D.C. Cir. 2005). Before the district court, the requesters argued that the NEDPG was not an "agency" under FOIA because it constituted part of "the President's immediate personal staff or units in the Executive Office [of the President] whose sole function is to advise and assist the President" and, the Supreme Court has clarified that such entities are excluded from FOIA's definition of "agency." *Judicial Watch, Inc.*, 310 F. Supp. 2d at 312–13 (alteration in original) (quoting *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136 (1980)). Thus, communications between the agencies and NEDPG could not be called "inter-agency" under FOIA. The requesters also argued that communications were not "intra-agency" because they were not sent by individuals within the same agency, and the consultant corollary did not apply because the agencies were not receiving advice from a non-agency. Rather, the agencies were giving advice to the non-agency Executive Branch entity. *Id.* at 314.

The district court agreed on both counts, concluding that the records in question were not protected by Exemption 5. *Id.* at 315–16. The court explained that "where [an] agency is responding to an outside request for information in connection with a non-agency's decision-making, such communications would be protected only if an agency decision can also be

identified." *Id.* at 315.  Because the records "were not received or created to assist the agencies 'in the performance of [their] own functions,' *Klamath Water Users*, 532 U.S. at 10, but to assist another governmental entity, the non-agency NEPDG, in the performance its functions," the district court found the consultant corollary inapplicable.  *Judicial Watch, Inc.*, 310 F. Supp. 2d at 315.

The D.C. Circuit affirmed in part, reversed in part, and remanded the case to the district court.  *See Judicial Watch, Inc.*, 412 F.3d at 133.  Critically, the Circuit agreed with the district court that "NEPDG is not itself an 'agency' subject to the FOIA because its sole function is to advise and assist the President."  *Id.* at 129.  The Circuit likewise agreed that the non-agency had "initiated the policy development process."  *Id.* at 131.  However, the Circuit reasoned that Exemption 5 might nonetheless apply.  It explained that "[n]either Exemption 5 nor the cases interpreting it distinguish between the decision-making activities of an 'agency' subject to the FOIA and those of the President and his staff, who are not subject to the FOIA."  *Id.* at 129.  The unitary structure of the Executive Branch buttressed the Circuit's conclusion:  "We are aware of no reason to believe—indeed, we think it inconceivable—the Congress intended Exemption 5 to protect the decision-making processes of the Executive Branch when the decision is to be made by 'agency' officials subject to oversight by the President and not when the decision is to be made by the President himself and those same agency officials are acting in aid of his decision-making process."  *Id.* at 130; *cf. Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 216 (D.C. Cir. 2013) (explaining that Congress exempted record generated by the President, his personal staff, and units in the Executive Office of the President).  As another court in this jurisdiction explained, *Judicial Watch v. Department of Energy* stands for the proposition that "the threshold requirement is satisfied for communications exchanged between agencies and the

Office of the President, even though that office is not an agency for the purposes of FOIA." *Judicial Watch, Inc. v. Consumer Fin. Protection Bureau*, 60 F. Supp. 3d 1, 10 (D.D.C. 2014); *see also id.* at 9–10 (concluding that an email sent from a White House staffer to an employee at the Consumer Financial Protection Bureau requesting advice regarding a congressional hearing met the threshold requirement for protection under FOIA Exemption 5).

The upshot of the Circuit's precedents appears to be that the "inter-agency or intra-agency" designation applies to (1) records exchanged between and among entities defined as agencies under FOIA, (2) records exchanged between an agency and a non-agency Executive Branch entity that advises and assists the President, and (3) records exchanged between an agency that is subject to FOIA and consultants advising that agency on its policy matters.

### b. Deliberative Process Privilege

Even if a document qualifies as inter-agency or intra-agency, it must also fall within the ambit of a privilege against discovery for Exemption 5 to apply. In this case, State relies entirely on the deliberative process privilege, which "protects 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated.'" *Loving v. U.S. Dep't of Def.*, 550 F.3d 32, 38 (D.C. Cir. 2008) (quoting *Klamath*, 532 U.S. at 8). "The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions, by protecting open and frank discussion among those who make them within the Government." *Klamath*, 535 U.S. at 8–9 (internal citations and quotation marks omitted). The privilege "helps to prevent premature disclosure of proposed policies and protects against public confusion through the disclosure of documents suggesting reasons for policy decisions

that were ultimately not taken." *Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 258–59 (D.D.C. 2004).

"To fall within the deliberative process privilege, materials must bear on the formulation or exercise of agency policy-oriented *judgment*." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992). A record qualifies for withholding only if it is both "predecisional" and "deliberative." *Access Reports v. U.S. Dep't of Justice*, 926 F.2d 1192, 1194 (D.C. Cir. 1991). "A document is predecisional if it is generated 'before the adoption of an agency policy.'" *McKinley v. FDIC*, 744 F. Supp. 2d 128, 138 (D.D.C. 2010) (quoting *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980)). Records are "deliberative" if they reflect "the give-and-take of the consultative process." *Coastal States Gas Corp.*, 617 F.2d at 866. "[T]o come within the privilege and thus within Exemption 5, the document must be a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Vaughn*, 523 F.2d at 1143–44. The key question in determining whether the material is deliberative "is whether disclosure of the information would 'discourage candid discussion within the agency.'" *Access Reports*, 926 F.2d at 1195 (quoting *Dudman Commc'ns Corp. v. U.S. Dep't of Air Force*, 815 F.2d 1565, 1567–68 (D.C. Cir. 1987)). To meet its burden, an "agency must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.'" *Senate of the Commonwealth of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585–86 (D.C. Cir. 1987) (quoting *Coastal States Gas Corp.*, 617 F.2d at 868).

### 2. Application

All six disputed documents that State has withheld under the deliberative process privilege—C05867882, C05892232, C05892233, C05892234, C05892235, and C05892237—

contain materials originally generated in preparation for the respective Senate confirmation hearings of Secretary of State nominee (and then-Senator) Hillary Clinton and Legal Adviser-Designate Harold Hongju Koh. *See* First Stein Decl. ¶¶ 34, 36–38, 42–43. State argues that the records—all of which were apparently drafted by individuals who were not employed by any entity regarded as an agency under FOIA—qualify for protection under the deliberative process privilege. State explains that all of these documents were created to prepare prospective high-level State Department officials "to understand relevant issues and to be ready to lead the agency upon his or her confirmation." Def.'s Renewed MSJ at 5. According to State, the disputed documents were generated "(1) to develop arrangements to ensure that a proposed Department head will avoid any potential ethics conflicts, and (2) in response to senatorial inquiries of two high-ranking State nominees, made in the Senate's oversight capacity, to align these nominees' proposed responses to established Department policy positions." Def.'s Renewed MSJ at 5. State argues that such materials should qualify for protection under Exemption 5 because the subject matter of the documents fairly relates to State Department policies and goals. Def.'s Renewed MSJ at 5. Judicial Watch disagrees, asserting that "agency discussions with a future official about his or her confirmation hearing are not exempt under FOIA." Pl.'s Renewed MSJ at 4. Judicial Watch argues that Clinton's emails to State—and communications sent by her staff—might show that she asked State for assistance in juggling her potential conflicts of interest, but her emails do not show that *State consulted her* on any agency decision. *See* Pl.'s Renewed MSJ at 4–5.

As the Court clarified above, D.C. Circuit precedent counsels that the "inter-agency or intra-agency" designation applies to (1) records exchanged between or among entities defined as agencies under FOIA, (2) records exchanged between an agency that is subject to FOIA and non-

agency Executive Branch entities that were created to advise and assist the President, and (3) records exchanged between an agency that is subject to FOIA and consultants advising that agency on its policy matters. The parties do not appear to argue that either of the first two bases might apply here. Accordingly, the Court limits its analysis to whether the consultant corollary protects the six disputed documents. As explained below, the Court concludes that State's Exemption 5 withholdings are proper and that the agency is entitled to summary judgment.

Under the consultant corollary, exchanges between an agency and outside consultants qualify as "intra-agency" for purposes of Exemption 5 if (1) the agency solicited the records from the non-agency party or there exists some indicia of a consultant relationship between the outsider and the agency, and (2) the records were created for the purpose of aiding the agency's deliberative process. The Court finds that both conditions are met here.

First, this Court concludes that the "solicited" condition is met under the circumstances of this case. In *National Institute of Military Justice v. U.S. Department of Defense*, 512 F.3d 677 (D.C. Cir. 2008), the D.C. Circuit intimated that the "solicited" requirement is met when there is "some indicia of a consultant relationship between the outsider and the agency." *Id.* at 686. Accordingly, the condition is certainly met when an agency has formally requested advice from a discrete group of experts, *see, e.g.*, *id.* at 679 (explaining that the Defense Department had solicited the opinions and recommendations of outside consultants), or when a consultative relationship is mandated by statute, *see, e.g.*, *Public Citizen, Inc. v. Dep't of Justice*, 111 F.3d 168, 170–71 (D.C. Cir. 1997) (finding a consultative relationship between two former presidents and the National Archives and Records Administration because, among other things, the Presidential Records Act establishes that the Archivist must consult the former presidents before deciding whether to allow access to restricted presidential records). But the Circuit has also

deemed more insubstantial contacts sufficient to satisfy the requirement. *See NIMJ*, 512 F.3d at

686–87. For example, in *Formaldehyde Institute v. Department of Health and Human Services*,

889 F.2d 1118 (D.C. Cir. 1989), the Circuit determined that comments sent by a peer-reviewed

journal to an HHS scientist rejecting a report that the scientists had submitted to the journal

qualified as "solicited." *Id.* at 1124. The Circuit explained that though the agency had not

"'solicit[ed]' reviews in the sense that it contract[ed] to receive them," the agency had "actively

s[ought] to do business with journals from which review are both expected and then used [by

agency components] to determine whether and in what form to publish articles in the name of the

agency." *Id.*

      Here, the Court does not doubt and finds reasonable State's claims that an agency and a

nominee to a high-level agency position must and will engage in communications to align their

messages, discuss logistics, and prepare the agency for new leadership. *See* Pl.'s Renewed MSJ

at 4–5. In light of the Circuit's precedents, this Court finds that the fact that an individual has

been nominated to a high-level agency position suffices to trigger a consulting relationship under

the consultant corollary. That relationship must extend not only to the nominee but also to those

acting on behalf of a nominee. Judicial Watch does not seem to contest that the documents were

created by individuals who were acting on behalf of nominees and that they were created at a

time when the president had already nominated the nominees and the nominees were proceeding

through their respective Senate confirmation processes. The Court, accordingly, concludes that

the "solicitation" requirement is met under the circumstances of this case.

      Having found that all of the disputed records qualify as solicited, the Court next considers

whether the records were created for the purpose of aiding the agency's deliberative processes.

This Court recognizes that it is not always readily apparently whether a record was created for

the purpose of aiding an agency's decisionmaking processes or for some other reason. *Cf. Competitive Enter. Inst.*, 161 F. Supp. 3d at 133 ("Whether a person is self-interested in a particular situation is not a binary question. . . . The point at which selflessness passes into self-interest is not demarcated by a bright line."). Indeed, the D.C. Circuit has recognized that, under some circumstances, a consultant and an agency may share common goals such that, even if the consultant appears to be acting to foster its own interests, its actions might also be construed as aiding an agency process. *See Formaldehyde Inst.*, 889 F.2d at 1124–25 (applying FOIA Exemption 5 to comments generated by a journal in determining whether to publish an article submitted by employees of a federal agency where those comments also aided the agency's process of determining whether to publish and in what form); *cf. Klamath*, 532 U.S. at 10 ("[N]or do we read the cases as necessarily assuming that an outside consultant must be devoid of a definite point of view when the agency contracts for its services."). As explained below, the Court concludes that the records at issue in this case—which were generated as part of the process of preparing two State Department nominees for their respective Senate confirmation hearings—were created for the purpose of aiding the agency's deliberative process.

Before considering the deliberative processes at issue in each disputed document, it bears mentioning the several overarching considerations underlying this Court's conclusion. First, the Court finds logical and reasonable State's explanation that an agency has a vested interest in preparing nominees for high-level agency positions to address potential conflicts of interests and to be ready to lead upon confirmation. In *Association for Women in Science v. Califano*, 566 F.2d 339 (D.C. Cir. 1977), a case in which the Circuit considered the applicability of FOIA Exemptions 4 and 6 to conflict of interest forms submitted by grant applicants that were on file with an agency, the Circuit described the government's "compelling need" for "accurate conflict

of interest information." *Id.* at 346. Under the Circuit's reasoning, it was not only in the

applicant's interest to preserve information about his or her potential conflicts, but also in the

interest of the agency to keep such information close to the vest. The Circuit explained:

> In the absence of a promise of confidentiality upon which they can
> rely, significant numbers of individuals might not apply for
> governmental positions, or perhaps worse, might apply, but fail to
> disclose information which could give evidence of a potential
> conflict of interest. At a time when public confidence in the
> institutions of government has been sharply eroded, it is imperative
> that the Executive indeed all branches of government be permitted
> to utilize every possible means to prevent further erosion.

*Id.* These concerns surely apply with even more force with respect to nominees to high-level

government positions, who are handpicked by the president and whose potential conflicts would

no doubt face more scrutiny than the average applicant's.

An agency has an interest in preventing the upheaval and distraction that would likely

result if potential conflicts were identified only after confirmation. And agency personnel can

hardly be expected to twiddle their thumbs and hope that either a nominee will reveal potentially

sensitive information irrespective of who might access it or that such information will come out

in the course of Senate questioning and that a nominee's private staff will have prepared her

adequately to field such inquiries. These concerns, this Court believes, go to the heart of the

deliberative process privilege, which "rests on the obvious realization that officials will not

communicate candidly among themselves if each remark is a potential item of discovery and

front page news." *Klamath*, 535 U.S. at 8–9 (quoting *NLRB*, 421 U.S. at 151). Thus, to the

extent that communications between an agency and a nominee bear on these matters, such

correspondence is not, as Judicial Watch seems to suggest, solely in the nominee's interest or

solely part of the nominee's decisionmaking processes.

Second, the Court finds equally logical and reasonable State's contention that it has an interest in discussing policy matters with nominees to high-level agency positions—prospective agency decisionmakers—to "align these nominees' proposed responses to established Department policy positions." *See* Def.'s Renewed MSJ at 5. As revealed in released portions of the disputed documents at issue here, nominees prepare not only to field questions regarding their experiences, their qualifications, and their past statements, but also to describe a vision for the future of the agency. This Court imagines such questions are not easily answered without some conception of what is feasible, what has already been considered, and what programs might be coming down the pike, among other things. To expose discussions intended to align a nominee's proposed responses with an agency's existing policies might prematurely disclose proposed policies and might create "public confusion through the disclosure of documents suggesting reasons for policy decisions that were ultimately not taken." *Judicial Watch, Inc.*, 297 F. Supp. 2d at 259.

Third, Judicial Watch seems to concede that some communications between an agency and a nominee regarding the nominee's plans might qualify as deliberative. *See* Pl.'s Reply at 1 (arguing that a communication "advising a nominee about the possible ways of establishing future ethics walls or screens to accommodate the nominee's potential conflicts of interest" would be the "one kind of communication between an agency and a pre-confirmation nominee that would be both deliberative and related to agency policy goals"). But the guidelines Judicial Watch proposes are overly rigid. It defies common sense to think that communications from an agency to a nominee advising about potential conflicts of interest should be protected but that communications from the nominee supplying the underlying information that would serve the basis for the agency's advice must be disclosed. This Court does not believe that the fact that

agency-nominee communications involve more than obviously unidirectional advice to the agency should defeat an agency's claim that the consultant corollary applies. All such communications are part of a fluid process that furthers the nominee's and the agency's shared interest in the nominee's smooth transition to power.

Finally and critically, application of the consultant corollary to communications generated as part of the process of preparing a nominee to a high-level agency position does not violate the rule established in *Klamath*. As explained above, in *Klamath*, the Supreme Court declined to fully endorse the consultant corollary or to clarify its reach, explaining only that "the intra-agency condition excludes, at the least, communications to and from an interested party seeking a Government benefit at the expense of other applicants." *Klamath*, 532 U.S. at 12 n.4. A nominee for a high-level agency position is not an interested party seeking a government benefit at the expense of others, but rather the president's selection for a position who will become an agency decisionmaker so long as he or she is confirmed by the Senate. Thus, *Klamath* does not preclude this result.

Having set out these general principles, the Court considers the specific deliberative processes at issue in each of the disputed documents.

### a. C05867882

Document C05867882 is an undated two-page draft letter from Hillary Clinton, then a Senator, to Deputy Legal Adviser and Designated Agency Ethics Official James Thessin regarding Clinton's "ethics undertakings," if she were to be confirmed as Secretary of State. Third Stein Decl. ¶ 4. The draft features "proposed revisions and red-line edits," suggestions presumably offered by State to Clinton. First Stein Decl. ¶ 34.

The Court concludes that this document qualifies as predecisional and deliberative. The document is deliberative because it served as "a direct part" of the collaborative process of assessing how a prospective agency head should manage potential conflicts of interest. *Vaughn v. Rosen*, 523 F.2d 1136, 1143–44 (D.C. Cir. 1975). The red-line edits and proposed revisions constitute "recommendations or . . . opinions on legal or policy matters." *Id.*; *see also Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) (holding that the deliberative process privilege "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency"). The document is predecisional because it was generated before the agency and the nominee reached any final decision regarding how best to address the nominee's potential conflicts of interest. Furthermore, as explained in detail above, release of documents of this sort would chill communications within an agency about how to ensure that nominees for high-level agency positions are identifying and managing potential conflicts of interest *before* any failure to do so erodes the public's confidence in the agency and agency officials. Accordingly, the Court grants State's motion for summary judgment with respect to this document and denies Judicial Watch's motion for the same.

### b. C05892232, C05892233, and C05892234

Document C05892232 is a five-page email exchange from Clinton's Deputy Chief of Staff Jacob Sullivan to Assistant Secretary of State for Legislative Affairs Richard Verma, dated April 20, 2009, forwarding a January 13, 2009, message from Cheryl Mills to Clinton that contains proposed talking points for addressing ethical considerations in Clinton's Senate confirmation hearing. Third Stein Decl. ¶ 5. Document C05892233 is a five-page email exchange from Sullivan to Verma, dated April 20, 2009, forwarding a January 12, 2009 message

from Sullivan to Clinton's Senior Advisor Philippe I. Reines.  Third Stein Decl. ¶ 6.  The contents of both messages were forwarded to Verma for consideration for use in preparing for another nominated individual's Senate confirmation hearing for a State Department position. First Stein Decl. ¶¶ 36–37.  Document C05892234 is an undated four-page document that contains a revised version of proposed talking points for addressing ethical considerations that are contained in documents C05892232 and C05892233.  Third Stein Decl. ¶ 7.

The Court concludes that State has met its burden of showing that these records were generated to aid with an agency policy deliberation and that the documents were predecisional. Courts in this jurisdiction have repeatedly concluded that talking points prepared for use in congressional testimony are deliberative and predecisional documents subject to FOIA Exemption 5.  *See, e.g., Competitive Enter. Inst. v. EPA*, 12 F. Supp. 3d 100, 119–20 (D.D.C. 2014) (finding that records "involv[ing] *how* to communicate with members of Congress . . . and *how* to prepare for potential points of debate or discussion" were exempt from disclosure under the deliberative process privilege); *Judicial Watch v. U.S. Dep't of Homeland Sec.*, 736 F. Supp. 2d 202, 208 (D.D.C. 2010) (deeming exempt under the deliberative process privilege records that "discuss[ed] how to respond to on-going inquiries from the press and Congress"); *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 306 F. Supp. 2d 58, 71–72 (D.D.C. 2004) (protecting communications prepared to assist an agency head for congressional testimony).  That these documents were prepared to serve nominees rather than presently serving-officials makes them no less deliberative.  They were generated as part of the collaborative process between a nominee and an agency of determining how the nominee should field questions from Congress about matters that bear on agency policy.  Thus, the Court concludes that the deliberative process privilege applies.

In addition, one of Stein's declarations establishes that Sullivan forwarded both messages in Documents C05892232 and C05892233 to State so that State could use the contents to prepare for an official's Senate confirmation. First Stein Decl. ¶¶ 36–37. It is apparent that State asked for Sullivan's assistance on a matter on which an employee would otherwise advise the agency—namely, matters related to preparation for a confirmation hearing. There is no indication that when Sullivan supplied this information, he might have been acting in any purely self-interested capacity. This too provides a sufficient basis for finding that these documents were part of agency deliberative processes. The Court grants State's motion for summary judgment with regard to C05892232, C05892233, and C05892234.

### e. C05892235 and C05892237

Document C05892235 is an eight-page document dated January 12, 2009, which contains nine questions for the record from former Senator Russ Feingold for Clinton relating to her confirmation hearing as Secretary of State and Clinton's proposed responses to the questions. Third Stein Decl. ¶ 8. Document C05892237 is an undated sixty-five page document that contains forty pre-hearing questions submitted by Senator Richard Lugar for Legal Advisor-Designate Koh and Koh's proposed responses. Third Stein Decl. ¶ 9. State contends that both documents contain "response[s] to senatorial inquiries of two high-ranking State nominees, made in the Senate's oversight capacity, to align these nominees' proposed responses to established Department policy positions." Def.'s Renewed MSJ at 5.

The Court need not belabor its analysis. As with talking points, draft responses generated by a nominee and an agency that deliberate about how to respond to questions from Congress

about matters of agency policy qualify as deliberative and predecisional.[3]  *See Judicial Watch, Inc. v. Clinton*, 880 F. Supp. 1, 13 (D.D.C. 1995) (preliminary drafts of a proposed response to a congressional inquiry "represent[ed] the personal opinion of the author, not yet adopted as the final position of the agency, thus exempt from FOIA disclosure").  The Court therefore grants summary judgment for State with respect to these documents as well.

***

State has met its burden of showing that all six disputed records qualify as "inter-agency or intra-agency" and that all six documents are deliberative and predecisional.  Furthermore, the Court finds that none of the disputed documents contain reasonably segregable material.  *See Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007).  Accordingly, this Court concludes that the deliberative process privilege shields the documents from disclosure and that State is entitled to summary judgment.

### B.  Records Withheld Under FOIA Exemption 6

Judicial Watch also initially sought disclosure of the domain extensions of non-state.gov email addresses contained in two of the above documents—C05892232 and C05892233.  State contends that it cannot release the domain extensions without compromising substantial third-party privacy interests.  Because Judicial Watch has since abandoned its challenge to these withholdings and because, in any event, the Court concludes that State has shown that FOIA

---

[3]  Indeed, because final responses to these written queries are publicly available, it appears that all Judicial Watch hopes to gain from accessing the draft responses is insight into the deliberative process.  *See Hearing on the Nomination of Hillary R. Clinton to be Secretary of State Before the Comm. on Foreign Relations*, 111th Cong. 192–95 (2009), https://www.gpo.gov/fdsys/pkg/CHRG-111shrg54615/pdf/CHRG-111shrg54615.pdf; *Hearing on the Nomination of Harold H. Koh to be Legal Adviser to the Department of State*, 111th Cong. 33–47 (2009), https://www.gpo.gov/fdsys/pkg/CHRG-111shrg65250/pdf/CHRG-111shrg65250.pdf.

Exemption 6 protects the email domain extensions, the Court enters summary judgment for State regarding these withholdings.

FOIA exempts "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). This exception also protects "bits of personal information, such as names and addresses, the release of which would create a palpable threat to privacy." *See Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 (D.C. Cir. 2015) (alteration and quotation marks omitted). These "bits of information" are protected only if they "can be identified as applying to that individual." *See U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982) (citing H.R. Rep. No. 1497, 89th Cong., 2nd Sess., 11 (1966), *as reprinted in* 1966 U.S.C.C.A.N. 2418, 2428); *accord Gov't Accountability Project v. U.S. Dep't of State*, 699 F. Supp. 2d 97, 106 (D.D.C. 2010) ("Because those email addresses can be identified as applying to particular individuals, they qualify as 'similar files' under Exemption 6 . . . ."). "[U]nder Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act." *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 261 (D.C. Cir. 1982). To determine whether disclosure is warranted, the court must first determine "whether the third[]party has more than a *de minimis* privacy interest in the requested material." *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 840 F. Supp. 2d 226, 231 (D.D.C. 2012) (citing *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 12 (D.C. Cir. 2011)). "If such an interest exists, the court must then determine whether the third[] party's privacy interest is outweighed by the public interest in disclosure." *Id.* (citing *ACLU*, 655 F.3d at 6). The case law is clear that there is a substantial privacy interest in full email addresses. *See, e.g.*, *Gov't Accountability Project*, 699 F. Supp. 2d at 106.

In the prior round of summary judgment briefing in this case, this Court considered Judicial Watch's request for the private email addresses contained in responsive records. *See Judicial Watch I*, No. 15-cv-688, 2017 WL 456417, at *12. The Court observed that "[t]he case law is clear that there is a substantial privacy interest in full email addresses," and that "[t]he public does not have a significant interest in the email addresses contained within the redacted emails." *Id.* at *11–12. However, explaining that mere domain extensions do not trigger substantial third-party privacy interests, the Court ordered State to release the "email domain extensions that, based on previous releases could not be used to infer the full email addresses in Documents C05892232 and C05892233." *Id.* at *12.

State again seeks summary judgment on the basis of personal privacy, asserting that it has determined that none of the email domain extensions featured in the responsive records can be released as the information can be used to infer the full email addresses. In support of this claim, it supplies a declaration clarifying that the prefix for an email address belonging to Jacob Sullivan has already been publicly released on the State Department website. Third Stein Decl. ¶ 16. Judicial Watch initially argued that State had not met its burden because State had not supplied a link and identified a specific document where the corresponding email prefix was published. Pl.'s Renewed MSJ at 6–7. Judicial Watch abandoned its challenge to State's withholding of the email domain extensions, however, after State supplied such information. Pl.'s Reply at 2.

Even if Judicial Watch had not abandoned its request, the Court would find that State has met its burden. Having reviewed the disputed documents *in camera*, it is apparent to the Court that State has already released to Judicial Watch the email prefixes for every email address appearing in the disputed documents except for the one belonging to Jacob Sullivan. Thus, the

Court has no trouble concluding that the domain extensions for these addresses are not subject to release because, as the Court observed in its prior Opinion, "a keen observer could piece together the redacted documents to ascertain the full email addresses. *See Judicial Watch I*, No. 15-cv-688, 2017 WL 456417, at *11. Accordingly, State is entitled to summary judgment with regard to these withholdings.

## V. CONCLUSION

For the foregoing reasons, Defendant's renewed motion for summary judgment is **GRANTED**, and Plaintiff's renewed cross-motion for summary judgment is **DENIED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: March 29, 2018                                        RUDOLPH CONTRERAS
                                                             United States District Judge